WR-50,961-07
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 4/7/2015 10:49:18 PM
Accepted 4/8/2015 8:47:42 AM
ABEL ACOSTA
CLERK

**IN THE**
**COURT OF CRIMINAL APPEALS OF TEXAS**
**AND**
**THE 21ST JUDICIAL DISTRICT COURT**
**BASTROP COUNTY, TEXAS**

RECEIVED
COURT OF CRIMINAL APPEALS
4/8/2015
ABEL ACOSTA, CLERK

| | | |
|---|---|---|
| EX PARTE | § | Writ Cause No. 50, 961.07 |
| | § | |
| RODNEY REED, | § | |
| | § | Trial Cause No. 8701 |
| Applicant. | | |

---

**RESPONSE TO STATE'S MOTION TO DISMISS APPLICATION FOR
WRIT OF HABEAS CORPUS AS ABUSIVE**

---

*THIS IS A DEATH PENALTY CASE*

BRYCE BENJET
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth St. Suite. 701
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)

ANDREW F. MACRAE
State Bar No. 00784510
LEVATINO|PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8563
(512) 637-1583 (fax)

*Attorneys for Applicant Rodney Reed*

# TABLE OF CONTENTS

Table of Contents ................................................................................. i
I.    Introduction ............................................................................... 1
II.   The State's Erroneous Procedural Arguments ..................................... 2
      A.   Mr. Reed's *Elizondo* Claim Can be Considered under
           Article 11.071§5(a)(2) ....................................................... 2
      B.   The Factual Unavailability Requirement of Article
           11.071§5(a)(1) Does Not Apply to the Separate
           Innocence Gateway Provision of Section 5(a)(2) ..................... 3
      C.   Mr. Reed's Claim under Article 11.073 is Properly
           Reviewed under Section 5 of Article 11.071 .......................... 5
      D.   Mr. Reed's False Testimony Claim is Properly
           Reviewed under Section 5 of Article 11.071 .......................... 6
III.  Response to State's Argument on Merits of Claims .......................... 8
      A.   Dr. Bayardo's Declaration is a Change in his
           Scientific Opinion ............................................................ 8
      B.   The Law of the Case Does Not Control this Court's
           Consideration of the False Testimony Claim ......................... 14
      C.   The State's Response to the Merits of the False Testimony
           Claim is Contradicted by the Record .................................. 16
      D.   The State's Defense of its Unreliable Expert Testimony
           Predicting Future Dangerousness Does Not
           Comport with the Law or the Facts .................................... 25
      E.   The Totality of the Evidence Proves Innocence ..................... 27
IV.   Conclusion ............................................................................. 36

**RESPONSE TO STATE'S MOTION TO DISMISS APPLICATION FOR WRIT OF HABEAS CORPUS AS ABUSIVE**

## I. Introduction

Absent from the State's Motion to Dismiss is any evidence contradicting the compelling scientific proof and factual accounts which establish Mr. Reed's innocence. Instead, the State has resorted to misrepresentation of the factual record and a cynical distortion of this Court's law. The State's Response appears to be aimed solely at preventing any meaningful inquiry into the growing body of evidence that the State convicted the wrong man for the murder of Stacey Stites.

In the past few years, the Legislature and this Court have created new avenues directed towards cases like Mr. Reed's—convictions based on faulty or misleading forensic science. *See* Tex. Code Crim. Proc. Art. 11.073; *Ex parte Chavez*, 371 S.W.3d 200 (Tex. Crim. App. 2012). Because Mr. Reed's application for writ of habeas corpus (1) raises compelling proof establishing innocence and other constitutional violations and (2) falls plainly within the statutory criteria for successive habeas applications, this Court should remand the case for a hearing at which Mr. Reed may prove his claims and obtain the relief requested in his application.

1

## II. The State's Erroneous Procedural Arguments

The State's Motion to Dismiss is focused primarily on procedural defenses to Mr. Reed's claims and rests on an inaccurate construction of the law and the record in this case. Contrary to the State's assertions, all of the claims raised in Mr. Reed's Application for Writ of Habeas Corpus are properly before the Court and supported by a compelling factual record.

### A. Mr. Reed's *Elizondo* Claim Can Be Considered Under Article 11.071§5(a)(2).

The State bases its procedural challenge to Mr. Reed's substantive innocence claim on a faulty construction of this Court's opinion in *Elizondo* and the innocence procedural gateway set forth in section 5(a)(2) of Article 11.071 of the Texas Code of Criminal Procedure. Article 11.071§5(a)(2) excuses the procedural default of a claim where an applicant shows "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt." In a footnote, the State argues that Mr. Reed's actual innocence claim cannot be considered under section 5(a)(2) because an *Elizondo* claim does not raise "a claim of constitutional error at trial." Motion to Dismiss at 19 n.13. However, the plain language of section 5(a)(2) does not limit the provision to trial error, and section 5(a)(2)'s "no rational juror" standard actually mirrors the standard set forth in *Elizondo* that Due Process is violated where there is clear and convincing evidence that no rational juror

2

would convict. *See Ex parte Elizondo*, 947 S.W.2d 202, 210 (Tex. Crim. App. 1996). Where an innocence claim under *Elizondo* entails the same element of proof required by section 5(a)(2), the State's attempt to limit section 5(a)(2) to non-innocence trial error falls flat. Indeed, this Court has granted habeas relief under *Elizondo* repeatedly without requiring a showing of factual or legal unavailability pursuant to section 5(a)(1). The State's argument that the innocence gateway provision of section 5(a)(2) does not apply to innocence claims under *Elizondo* is inconsistent with the plain language of the law, this Court's prior decisions, as well as common sense, and should be rejected.[1]

**B.    The Factual Unavailability Requirement of Article 11.071§5(a)(1) Does Not Apply to the Separate Innocence Gateway Provision of Section 5(a)(2).**

The State makes a secondary argument that Mr. Reed has not made a prima facie showing of innocence under section 5(a)(2) because he has not shown that the new evidence of innocence "could not have been known [to an applicant] even with the exercise of due diligence." Motion to Dismiss at 25 (quoting dicta in *Ex parte Brown*, 205 S.W.3d at 545). As the State acknowledges, this argument would invite the Court to graft a showing of "factual unavailability" under the separate provision for review of procedurally defaulted claims set forth in section

---

[1] The State's contention that Mr. Reed failed to brief how his *Elizondo* claim fits within section 5(a)(2) of article 11.071 ignores the fact that clear and convincing proof of innocence under *Elizondo* would by definition meet the preponderance standard set forth in section 5(a)(2).
[2] This Court's opinion in *Ex parte Brown* contains some language suggesting a diligence

3

5(a)(1) for evidence of innocence to be considered under the innocence gateway provision of section 5(a)(2). *See* State's Motion to Dismiss at 25 (unavailability discussion dovetails with newly-available requirement of freestanding innocence claim). This construction of the law conflicts with the legislative intent of section 5(a)(2) as well as traditional principles of statutory construction.

This Court explained in its consideration of Mr. Reed's prior habeas proceeding that the adoption of an innocence gateway for review under section 5(a)(2) was intended as a codification of the *Schlup* innocence standard:

> Because Article 11.071, Section 5(a)(2) was enacted in response to the Supreme Court's decision in *Schlup*,[28] we conclude that standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2). Therefore, to mount a credible claim of innocence, an applicant "must support his allegations of constitutional error with reliable evidence— whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."

*Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008). The only requirement for consideration of factual evidence under *Schlup* is that the evidence "was not presented at trial." *See id.*[2]

---

[2] This Court's opinion in *Ex parte Brown* contains some language suggesting a diligence requirement. *See* 205 S.W.3d at 545. However, the Court in *Ex parte Brown* did not cite any authority for the proposition, and the facts of the case involved evidence which had already been presented to the trial court in a motion for new trial. *See id.* at 547 (rejecting *Schlup* claim based on evidence raised and rejected on motion for new trial). The case did not actually involve a diligence inquiry and the dicta suggesting this inquiry as an element should be disregarded.

The State's asserted "newly available" requirement also does not appear in the plain language of section 5(a)(2). This unwritten requirement was inferred only because of the legislative intent to codify *Schlup*. The Court should not now further construe section 5(a)(2) in a manner that deviates from the *Schlup* standard and renders the provision meaningless. Reading the State's proposed factual unavailability requirement into section 5(a)(2), would render that subsection meaningless. Where all claims supported by factually unavailable evidence are reviewed under section 5(a)(1): there would be no purpose of adding a separate but identical pathway for claims raising innocence. Accordingly, this Court should reject the State's attempt to bar consideration of the substantial evidence of innocence in determining whether Mr. Reed has met the section 5(a)(2) innocence gateway standard. *See Chevron Corp. v. Redmon*, 745 S.W. 2d 314, 316 (Tex. 1987) (Court declines construction that renders statutory terms meaningless).

## C. Mr. Reed's Claim under Article 11.073 is Properly Reviewed under Section 5 of Article 11.071.

This Court recently held in *Ex parte Robbins*, that a claim brought under article 11.073 meets the "legal unavailability" requirement for review set forth in section 5(a)(1). --- S.W.3d ---, 2014 WL 6751684 (Tex. Crim. App. November 26, 2014) (reh'g filed). *Ex parte Robbins* is cited in Mr. Reed's application and conclusively demonstrates his right to review.

Likewise, a claim brought under article 11.073 will meet both the "factual unavailability" requirement of section 5(a)(1) and the innocence gateway provision in section 5(a)(2) because the merits showing under article 11.073 requires a showing of the elements of each of these provisions. Specifically, a claim under 11.073 must be based on "new science" that was not ascertainable through the exercise of reasonable diligence of the convicted person—the same standard applicable under section 5(a)(1). *Compare* Tex. Code Crim. Proc. Art. 11.073(b)(1) *with* id. Art. 11.071§5(a)(1). Furthermore, an applicant bringing a claim under article 11.073 must show by a preponderance of the evidence that he would not be convicted. This is essentially the same innocence showing as required under the *Schlup* standard set forth in article 11.071§(5)(a)(2).

### D. Mr. Reed's False Testimony Claim is Properly Reviewed under Section 5 of Article 11.071.

After a page and a half of briefing to the contrary, the State acknowledges in its motion (as it must) that Mr. Reed's unknowing use of false testimony claim constitutes a new legal basis for review under article 11.071§5(a)(1). *See* Motion to Dismiss at 34 (*citing Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012)).[3] Because Mr. Reed's last prior habeas application was filed in this Court

---

[3] The State's accusation that Reed should have filed his false testimony claim earlier is especially disingenuous because the State opposed Mr. Reed's 2012 motion to abate the federal proceedings so that the claim could be presented to this Court in 2012. *See* Motion for Leave to Amend Petition and Abate Proceeding, *Reed v. Dretke*, No. 02-CV-00142-LY (Dkt. # 188);

6

on May 5, 2009, before this Court announced its decision that the unknowing use of false testimony violates Due Process in *Ex parte Chabot*, 300 S.W.3d 768 (Tex. Crim. App. December 9, 2009), the legal basis for his claim was unavailable and his claim may be reviewed under section 5(a)(1).

Mr. Reed's claim regarding the recantation of the State's expert witnesses Dr. Bayardo and Meghan Clement was likewise factually unavailable. Article 11.071 §5(e) defines factual unavailability for the purposes of section 5(a)(1) as "not ascertainable through the exercise of reasonable diligence" at the time the prior state habeas application was filed. In this case, Mr. Reed's counsel investigated the forensic evidence in the case and presented evidence contradicting the State's theory at trial. However, there was no indication at any time that the State's expert witnesses had changed their mind, and absent some evidence known to the applicant of a recantation, reasonable diligence would not require a periodic re-interview of the State's experts to determine if they were now to contradict the sworn testimony offered at trial or disclaim the obvious inferences drawn from their sworn trial testimony.

Respondent Thaler's Response in Opposition to Petitioner's Motion for Post-Judgment Amendment and Abatement of the Proceeding, *Reed v. Dretke*, No. 02-CV-00142-LY (Dkt. # 189).

7

## III. Response to State's Arguments on Merits of Claims

Mr. Reed refers the Court generally to his Application and the attached evidence and incorporates that argument and evidence into this Response. This Response will address only those issues which are new, or require additional discussion.

### A. Dr. Bayardo's Declaration is a Change in his Scientific Opinion

In response to Mr. Reed's claim under article 11.073, the State argues that the new opinions offered in Dr. Bayardo's declaration do not constitute a change in his scientific opinion. *See* Motion to Dismiss at 28-31. This contention is not supported by the record. Taken point by point, the arguments made by the State simply do not hold up to a careful reading of the record.

- **Reversal on Time of Death**

The State argues that Dr. Bayardo's retraction of his estimate of the time of death at 3:00 a.m. was not a change in his opinion at trial because Dr. Bayardo admitted at trial that no precise determination of time of death can be made, "we can only make estimates." Motion to Dismiss at 29 (quoting 48 RR 113). However, the State's citation to the record is misleading. What Dr. Bayardo actually said to the jury that convicted Mr. Reed was as follows:

> Q. Okay, is time of death and making that determination, is that an exact science?

8

A. No. it's not a precise scientific way of making a determination of the time of death, we can only make estimates.

Q. With an hour or two hours or something like that?

A. Or four hours or so.

\*\*\*

A. Based on the changes that occur after death in the body, I make an estimation of the time of death being around 3:00 a.m. on April 23, 1996.

Q. And you indicated that that's somewhere within a short period of time around that one way of the other?

A. Give or take one or two hours.

48 RR 113-14. Accordingly, Dr. Bayardo clearly testified that the time of death was between 1 a.m. and 5 a.m. on April 23, 1996. He could not pinpoint the precise moment of Ms. Stites's death, but he provided the jury with a four hour range.[4]

In his declaration, however, Dr. Bayardo retracts his estimate as unreliable:

If the prosecuting attorneys had advised me that they intended to use my time of death estimate as a scientifically reliable opinion of when Ms. Stites died, I would have advised them not to do so.

Application at Exhibit 1. Yet that is exactly what happened at Mr. Reed's trial. In the State's closing argument, the prosecutor told the jury:

---

[4] The State makes the same misleading argument in its effort to discount the new time of death estimates provided by Mr. Reed's experts Drs. Spitz, Baden, and Riddick. At page 47 of its Motion to Dismiss, the State contends that this Court should not credit new estimates placing Ms. Stites's time of death at before midnight on April 22, 1996 because "dogmatic and pinpoint accuracy in this matter is clearly not achievable." *Id*. However, none of the habeas experts attempted to pinpoint the precise moment of death. Each gave a range of several hours, each of which contradicting the State's theory of Mr. Reed's guilt.

9

> Now we know that [Stacey] didn't get killed at midnight the night before or seven o-clock or whenever the night before because Dr. Bayardo tells us that, that Stacey died within an hour of three o'clock.

56 RR 74. Viewing the record, and the manner in which Dr. Bayardo's testimony was used by the State, Dr. Bayardo's retraction of any reliability as to his estimated time of death must be viewed as a change in science relied on by the State. *See Ex parte Robbins*, --- S.W.3d ---, 2014 WL 6751684 at *5 (change in science found where State's forensic pathologist changed opinion from homicide to "undetermined", but still considered death "suspicious").

- **Reversal on Intact Sperm as Evidence of Sexual Assault by Reed**

Again citing bits of the record out of context, the State argues that Dr. Bayardo's new opinion on whether Mr. Reed's semen is related to the sexual assault was no different from his opinions offered at trial. For example, the State claims that Dr. Bayardo's testimony at trial that the sperm he found were placed "a day or two" before his 1:50 p.m. autopsy examination on April 24, 1996 served as a substitute for direct scientific evidence that intact sperm can be found, as a general rule for up to 72 hours. *See* Motion to Dismiss at 29. As with its misleading citation to the testimony on the time of death, the State also fails to mention follow up testimony by Dr. Bayardo which identifies the presence of semen as a key element in his opinion that Ms. Stites was anally sexually assaulted by Mr. Reed contemporaneous with her death:

10

Q. Okay, your contention that the presence of sperm and the presence of semen is a result of non-consensual sexual intercourse?

A. No, my contention is the dilated anus and the scrapes in the anus and the presence of semen, yes.

48 RR 145; see also 48 RR 126-127 (anal sexual assault at time of death).

Contrary to the argument presented in the Motion to Dismiss, that Dr. Bayardo's testimony somehow contradicted the State's case, the State clearly understood Dr. Bayardo's opinion as refuting any possibility of a consensual encounter between Mr. Reed and Ms. Stites by arguing at closing:

> Dr. Bayardo's testimony was hard, and I know it was, and it was hard because I saw it on your faces, on many of your faces, the realization of it. The realization and sort of visualization of really what we are talking about in this case I think finally hit and the realization of a 19-year-old girl being sodomized while the life was being taken out of her while this belt was around her neck.

56 RR 39-40.

Comparing Dr. Bayardo's trial testimony to his declaration, the State again selectively quotes the declaration in a misleading fashion that overlooks the force of his recantation. Motion to Dismiss at 29 (quoting Bayardo that sperm "could" have been deposited days earlier). This quotation fails to inform the Court of Dr. Bayardo's next sentence making a case-specific conclusion that directly contradicts his trial testimony:

> Further the fact that I found "very few" (as stated in the autopsy report) spermatozoa in Ms. Stites's vaginal cavity suggests that the

11

spermatozoa was not deposited less than 24 hours before Ms. Stites's death.

Application at Exhibit 1 ¶ 4. Translating the double negative, Dr. Bayardo's current opinion is that intercourse between Reed and Stites was more than 24 hours before her death. This corroborates Mr. Reed's account of a consensual relationship in which they last had sex between midnight and 3 a.m. on April 22, 1996 and directly contradicts Dr. Bayardo's conclusion at trial that the sperm was placed 1-2 days before his examination after 1:50 p.m. on April 24, 1996—1:50 p.m. on April 22, at the earliest. Dr. Bayardo's trial estimate was less than 24 hours before death (not more) and ruled out consensual sex because Ms. Stites was accounted for from the time she arrived home from work at 1:30 p.m. on April 22, 1996. *See* Application at Exhibit 8 (statement of Carol Stites describing Stacey's whereabouts on the afternoon and evening of April 22, 1996).

- **Reversal on Anal Injury as Evidence of Sexual Assault by Reed**

   The State also relies on an incomplete and misleading reading of Dr. Bayardo's declaration in its argument that Dr. Bayardo has not changed his opinion that the anal injury he believes was present implicated Mr. Reed in the murder. It cites Dr. Bayardo's above-quoted trial testimony that his finding traces of Mr. Reed's semen in the rectal samples and the injury to the anus was evidence that Mr. Reed sexually assaulted Ms. Stites contemporaneous with her murder. *See* Motion to Dismiss at 31. The State then argues that because Dr. Bayardo

12

reaffirmed his belief that "Stites was sexually assaulted in her anal cavity," there is "not an about-face of his trial testimony." *Id*.

The State's contention only sounds reasonable if the Court does not actually read Dr. Bayardo's declaration or even the remainder of the sentence quoted by the State. Although Dr. Bayardo still holds to his flawed opinion that abrasions and dilation seen at autopsy show anal penetration, he also retracts his trial testimony in which he claimed to find possible sperm heads on the rectal samples. Application Exhibit 1 ¶5 ("My trial testimony should not have been construed as suggesting that spermatozoa were indeed found in Ms. Stites's rectal cavity.") This statement is the opposite of what the State argued to the jury in closing:

> [Dr. Bayardo] also, if you will recall, looked at the swabs from the rectal swabs and remember what he said. He said he saw a small amount of what appeared to him to be broken up heads and tails of spermatozoa.

56 RR 35. The State's incomplete quotation of Dr. Bayardo's declaration regarding the evidence of anal sexual assault strains any semblance of candor. Far from supporting his trial testimony linking Mr. Reed's semen to his believed assault, Dr. Bayardo states:

> In my opinion, Ms. Stites was sexually assaulted in her anal cavity, ***and that assault did not result in the deposit of semen.***

Application Exhibit 1¶ 6. Dr. Bayardo then reiterated that the anal injury he perceived was not related to the presence of Mr. Reed's semen:

13

> The injuries to Ms. Stites's anus are certainly consistent with penile penetration, as I testified, but if there was penile penetration, there was no ejaculation. I understand that the sexual assault for which Mr. Fennell was convicted did not involve ejaculation. This is consistent with the sexual assault on Ms. Stites. Further, the injuries to Ms. Stites's anus are more consistent with penetration by a rod-like instrument, such as a police baton.

*Id.* There is simply nothing consistent between Dr. Bayardo's trial testimony and his current opinions, and the State's misleading quotation of Dr. Bayardo's declaration and its refusal to acknowledge this obvious fact is devastating to the credibility of its Motion to Dismiss.

### B. The Law of the Case Does Not Control this Court's Consideration of the False Testimony Claim

Without providing any explanation why, the State argues that the merits of Mr. Reed's false testimony claim under *Ex parte Chabot* should be denied under the "law of the case" doctrine. The law of the case is a court-made, prudential doctrine in which a court has the discretion not to reconsider a determination of law that was made on a prior appeal to a court of last resort. *See Ex parte Granger*, 850 S.W.2d 513, 516 (Tex. Crim. App. 1993). The Texas Supreme Court has noted that the law of the case doctrine has a limited application in subsequent proceedings:

> The doctrine of the law of the case only applies to questions of law and does not apply to questions of fact. . . . Further, the doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved on

14

the first trial. . . . Thus, when in the second trial or proceeding, one or both of the parties amend their pleadings, it may be that the issues or facts have sufficiently changed so that the law of the case no longer applies.

*Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986) (citations omitted).

Further, the law of the case has no application where there has been a change in the controlling law. *City of Dallas v. Jones*, 331 S.W.3d 781, 785 (Tex. App.—Dallas 2010, pet. dism'd); *Council of Alt. Political Parties v. Hooks*, 179 F.3d 64, 69 (3d Cir. 1999) (statutory amendment rendered law of the case doctrine inapplicable). In this case, the false testimony claim is based in large part on new evidence in the form of admissions by Dr. Bayardo and Meghan Clement that the testimony offered at trial was misleading as well as the new affidavits of Drs. Spitz, Baden, and Riddick. The facts are not "substantially the same" and therefore must be considered by the Court anew.

The claim is also premised on a very different legal basis that was not even recognized at the time this Court decided Mr. Reed's prior habeas application. *See Ex parte Chavez*, 371 S.W.3d at 207. In an obvious misstatement of the law, the State asserts in a footnote that the legal standard for harm in a *Schlup* innocence gateway argument is the same as in a due process false testimony claim:

> . . . the standard for such a claim is "more likely than not" test, *see Ex parte Chabot,* 200 S.W.3d at 772, which is the same more likely than

15

not standard utilized in the *Schlup*-type claim already rejected by this Court. . .

Motion to Dismiss at 39 n.17. While both standards measure the evidence required to meet a harm element by a preponderance, the actual standard for harm is considerably less under this Court's false testimony jurisprudence. Where the State's witnesses testify falsely at trial—even inadvertently—the conviction must be reversed where it is shown by a preponderance that "could have affected the judgment of the jury." *Ex parte Robbins*, 360 S.W.3d at 459; *Ex parte Weinstein*, 421 S.W.3d 656, 665 (Tex. Crim. App. 2014) (false testimony violates due process where "reasonably likely to influence the judgment of the jury"). The false testimony standard does not implicate innocence at all. By contrast, an applicant under the *Schlup* (article 11.071§5(a)(2)) standard must show that no reasonable juror would have convicted based on the new evidence. *See House v. Bell*, 547 U.S. 518, 538 (2006) ("any reasonable juror would have reasonable doubt"). These are very different legal standards. Because both the factual record and the applicable law are not "substantially the same," the law of the case does not control this Court's consideration of Mr. Reed's false testimony claim.

### C. The State's Response to the Merits of the False Testimony Claim is Contradicted by the Record

The State's response to the merits of the false testimony claim focuses on bits of testimony in the record which the State contends rendered the opinions

16

provided by its experts technically accurate.  However, this Court has previously rejected the State's approach, explaining that even technically correct testimony still violates Due Process where the witness' testimony gives the trier of fact a false impression." *Ex parte Ghahremani*, 332 S.W.3d 470, 477 n. 14 (Tex. Crim. App. 2011).  Moreover, the Court has held that the presentation of unreliable expert opinion falls into the category of false testimony which violates due process. *See, e.g., Ex parte Graf*, Ap-11,003, 2013 WL 1232197 (Tex. Crim. App. March 27, 2013) (unreliable arson evidence); *Ex parte Henderson*, 384 S.W.3d 833, 835, 849-50 (Tex. Crim. App. 2012) (concurring opinions of Price and Cochran, JJ.).

The State first contends that the jury was not mislead when its expert witnesses claimed that the semen found in Ms. Stites's body was left during a sexual assault contemporaneous with her murder.  This unreliable theory was based in large part on Karen Blakley's testimony that the "outside" length of time intact sperm can remain in a body is 26 hours.  Motion to Dismiss at 38.  Although the State cannot credibly refute the known scientific literature showing that intact sperm can be found up to 72 hours after intercourse, it points to two "concessions" by Blakely that (1) "components of semen" could be found up to 120 hours after intercourse and (2) studies have shown that sperm was found in a body after 16 days.  *Id*.  Just as the State mislead the jury in 1998, it now seeks to mislead this

17

Court regarding the testimony offered by its witnesses on the survival of intact sperm and its relevance to the forensic investigation.

The testimony which the State construes as a "concession" by Blakely that components of sperm can be found up to 120 hours after intercourse, actually reinforces her testimony that <u>intact</u> sperm do not survive more than 26 hours:

> Q. And in that study, did they also say that internal vaginal swabs, you can find semen up to 120 hours later?
>
> A. That is semen, and all components of semen.
>
> Q. And by your testimony you're saying that intact semen up to 26 hours, is that the figure you gave?
>
> A. That's intact sperm, up to 26 hours.

45 RR 17. Blakley's testimony can only be viewed as a concession if the Court ignores both the content of what Blakely said and her answer to the question that immediately followed. Although Blakely testified that components of semen (presumably trace chemicals or sperm heads) can be found up to 120 hours after intercourse, she held firm that intact sperm cannot.

The State's characterization of Blakely's testimony concerning sperm found in a body 16 days after death is no more accurate when the actual testimony is examined:

> A. In a living woman, I would expect to find intact sperm, that means sperm with their tails on still, no longer than 24 to 26 hours. That's in a living person.

18

Q. Okay. Now in order to fill things out completely, you did some research, and there is one case where sperm was found in a body after 16 days, right?

A. That's correct.

Q. Explain to the jury the circumstances in that particular case?

A. This was a woman who was murdered in the mountains of Utah, in very high elevation, very dry air, very cold air. I think the temperatures were no higher than 50 and often were in the 20s at night, so the body was pretty much chilled as if the body were in a refrigerator the entire time up to the 16th day they were able to find sperm. So the body was kept cool the entire time from the time the victim died to the time that she was found.

Q. Other than that one anomaly, has the research indicated anything contrary to what you've testified to, to your knowledge?

A. No, that's the only case I know of.

55 RR 36-37. As with the statement mentioning 120 hours, Blakely's discussion of the 16-day example also does not differentiate between components of sperm and the relevant issue of finding intact sperm. And just like the statement mentioning 120 hours, Blakely immediately reiterated her unwavering scientific opinion that 24-26 hours is the maximum time intact sperm can be found.[5]

Meghan Clement's testimony falls more within the technically correct but misleading category of false testimony. *See Ex parte Ghahremani*, 332 S.W.3d at 477 n.14. And again, the State significantly downplays the record in its selective quotation of the witness. At trial, Clement offered expert testimony designed to

---

[5] When Blakley was interviewed by Mr. Reed's counsel Andrew MacRae, she declined to comment on her testimony. Blakley will presumably be subject to subpoena at a hearing.

inform the jury that the intact condition of sperm was an indicator as to the post-coital interval and corroborated Blakely's opinion that intact sperm cannot survive within the body for over 24-26 hours:

> Q. What is the significance of whether spermatozoa are intact or whether they are broken up?
>
> A. Generally the longer spermatozoa is – the longer amount of time of it being deposited to it being detected the more likely it's not going to be intact. With spermatozoa, the tails are very fragile and tend to break off, so after a short period of time they start losing their tails and then what you find is only the spermatozoa heads, from sexual assault cases. So that can be an indicator of how long the spermatozoa has been in a particular place before it is actually collected and detected.
>
> Q. And in the thousands of rape kits that you have looked at, when a vaginal swab is taken in the traditional way that it's taken, what's the longest time that you ever personally saw a lapse between a sexual encounter and in finding a fully intact spermatozoa?
>
> ***
>
> A. In serology work, typically, sexual assault kits weren't even collected more than 24 hours after an encounter because the chances of finding sperm is so rare. Generally, finding intact sperm at more than probably about 20 hours, 20 to 24 hours, I don't ever recall finding intact sperm more than that, from the time of the sexual assault and from the time the collection was made.
>
> Q. And that was in over thousands of rape kits?
>
> A. Yes.

51 RR 55-56. Consistent with Blakely's false testimony, the import of Clement's testimony was unmistakable—intact sperm generally could not be found more than 24 hours after intercourse.

20

Clement's e-mail clarification confirms the misleading nature of her trial testimony. She explains both that (1) her expert testimony about only seeing intact sperm after 24 hours was not based on the scientific literature and (2) because of the processing of the thousands of rape kits that Clement examined—as opposed to the directly applied smears examined by Blakely and Bayard—the rape kits were inherently less likely to retain intact sperm. *See* Application Exhibit 2. Clement now admits that her scientific opinion offered at trial was not actually grounded in science and did not even apply to the examination of direct smear samples like those collected and viewed by Dr. Bayardo and Ms. Blakely.

The State's attempt to rehabilitate Dr. Bayardo's false testimony regarding anal dilation also misreads the record and the science. First the State invites the Court to ignore the new evidence in the application and rely only on the Court's prior opinion rejecting earlier criticism of Dr. Bayardo's testimony relating anal dilation under the considerably higher *Schlup* standard. *See* Motion to Dismiss at 40. However, the basis of this Court's prior analysis of the evidence was its reliance on other evidence establishing sexual assault which Dr. Bayardo has now recanted and has been thoroughly discredited through the opinions of Dr. Spitz, Baden, and Riddick who conclude that the State's forensic case against Mr. Reed is medically and scientifically impossible. *See* Application Exhibits 3, 4, 5.

21

Further, the Court cited Ms. Stites's "life circumstances" and the absence of credible evidence of a prior relationship. *Ex parte Reed*, 271 S.W.3d at 749. The Application describes in great detail the extensive law enforcement records which contradict the State's rosy picture of Ms. Stites's relationship with Mr. Fennell and includes additional affidavits of two co-workers who had knowledge of the relationship. *See* Application at 15-31; Exhibits 6 (Affidavit of Alicia Slater), 7 (Affidavit of LeRoy Ybarra). The evidence of Mr. Reed's relationship with Ms. Stites has now been supplemented by Ms. Stites's own cousin, who has provided an affidavit in which he recounts seeing Ms. Stites with Mr. Reed at a Bastrop area Dairy Queen. *See* Exhibit A. As discussed supra Part III(B), this Court's prior consideration of parts of the evidence presented in the current application does not control. *See Hudson*, 711 S.W.2d at 630.

The State also criticizes the current evidence alleging that Applicant's experts do not "provide a timeframe in which one would expect to see anal dilation." Motion to Dismiss at 40. Although the experts will provide more clarification on this point if asked at a hearing, Drs. Spitz and Baden both describe post-mortem relaxation of the sphincter and the risk of misinterpreting this phenomena as evidence of anal sexual assault. Application Exhibit 3¶8; 4¶9. When these experienced forensic pathologists describe the post-mortem relaxation, they are referring to the initial flaccidity that occurs immediately after death. *See*

22

*Spitz and Fisher* at 101 (muscles become flaccid immediately after death followed by onset of rigor mortis); 120 (noting common error of confusing "post-mortem dilation and flaccidity" with evidence of sexual assault). This initial flaccidity is the recognized cause of the dilation observed by Dr. Bayardo, and his trial explanation of dilation naturally occurring only 4-5 days after death was false.

This Court should take note that Dr. Bayardo has admitted in another case that he was not aware of this basic problem in interpreting anal dilation at the time of his testimony in Mr. Reed's trial. Dr. Bayardo was criticized by the State and his opinions were contradicted when he gave similarly false testimony for the defense in *Stevens v. State*, 234 S.W.3d 748 (Tex. App.—Fort Worth 2007, no pet). In *Stevens*, Dr. Bayardo was retained as a defense expert in a case prosecuted by Assistant Attorney General Lisa Tanner—the same lawyer that presented Dr. Bayardo's testimony for the State against Mr. Reed. Kim Stevens was convicted for the child abuse-murder of a child that she was babysitting. *Id*. at 750-51. Dr. Bayardo testified that dilation he saw in the victim's anus was evidence that the child has been the victim of chronic anal sexual assault. *Id*. at 772. Even though Tanner had sponsored Bayardo's conclusion that anal dilation was evidence of sexual assault in Reed's case, the State cross-examined Dr. Bayardo at the Stevens trial and elicited his admission that he was unaware of basic medical knowledge in interpreting anal dilation:

He stated that he was not aware of how a medical professional should review a finding of anal dilation until the prosecutor showed him the medical authorities. He agreed that the medical literature says that a medical professional should be very cautious of equating anal dilation with sexual abuse because anal dilation may occur for many reasons. Until he was shown the medical literature, he was not aware that a correlation exists between a duodenal injury and anal dilation. He was aware of literature that anal dilation is not by itself an indicator of sexual abuse, but he would not change his handling of the case. He agreed that one of the books that he relied on said that anal changes could be postmortem anal dilation, which could be mistaken for sexual abuse.

*Id.* at 773. Dr. Bayardo's admission during the 2005 Stevens trial demonstrates a basic lack of understanding of the science discussing post-mortem anal dilation and his rejected opinion of sexual assault in that case shows that Dr. Bayardo fell into the common error warned of in the medical literature—that routine post-mortem anal dilation should not be mistaken for evidence of sexual abuse.

Ultimately, the State's response to the new forensic proof of innocence asks this Court to draw even more false inferences from bits of testimony obviously taken out of context. The Court should not follow this cynical path. When the new evidence is viewed in its totality, the Court can only conclude that the expert testimony provided to the jury was unreliable, and left a false impression that no responsible forensic scientist would today defend.

**D.** **The State's Defense of its Unreliable Expert Testimony Predicting Future Dangerousness Does Not Comport with the Law or the Facts**

In its Motion to Dismiss, the State claims that Due Process was not violated when its prison expert, Royce Smithey, testified in response to a hypothetical question that Mr. Reed would be dangerous in the future. The State argues that this expert opinion was not false, misleading or unreliable; but instead it was "just not admissible under the Texas Rules of Evidence." Motion to Dismiss at 41-42. In yet another example of the State's strategy of hiding the ball from this Court, the State fails to acknowledge the obvious fact that the rule of evidence involved, Tex. R. Evid. 702, is a test for reliability and relevance. *See Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010) ("trial judges must act as a true "gatekeeper" when addressing the reliability and relevance of expert testimony"). In the context of unreliable expert testimony, there is no distinction between admissibility and reliability. Ultimately, the jury was presented with the opinion of a career TDCJ employee who testified—with no reliable basis—that Mr. Reed would be dangerous in the future. Whether it came from a psychologist, psychiatrist, or a prison classification expert such as Mr. Smithey, the testimony was unreliable and therefore false under this Court's Due Process jurisprudence. *See, e.g., Ex parte Graf*, Ap-11,003, 2013 WL 1232197 (Tex. Crim. App. March 27, 2013); *Ex parte*

*Henderson*, 384 S.W.3d 833, 835, 849-50 (Tex. Crim. App. 2012) (concurring opinions of Price and Cochran, JJ.).

Furthermore, the State's citation to an "overwhelming" punishment phase case misses the impact of Mr. Smithey's false testimony. Acknowledging that Texas prisons are filled with serial offenders, the specific question asked by the State drew on Smithey's expertise as a classification expert—whether Mr. Reed presented a danger to other inmates in the general prison population. 63 RR 64-66. Further, the Court should not take the State's one-sided characterization of the additional aggravating evidence at face value. Mr. Reed absolutely disputes these allegations and because the Texas death penalty sentencing scheme does not require any specific findings as to aggravating factors, this Court cannot have confidence as to which if any of the extraneous offenses alleged by the State were actually believed by the jury. Among the list of sexual allegations levied against Mr. Reed at the punishment phase, the only case that he was actually prosecuted in (Connie York) led to an acquittal. No case was ever pursued against Mr. Reed from allegations of sexual misconduct by Mr. Reed's former girlfriends Caroline Rivas and Lucy Eipper. And for the two allegations in which some physical evidence linked Mr. Reed to an alleged sexual assault, the State has opposed Mr. Reed's request to utilize modern DNA technology to refute the 1998 era testing or

26

discover possible evidence of tampering.[6]  The State chose Mr. Smithey's expert opinion as its closing witness for a reason.  Once Mr. Reed was convicted of capital murder, the jury knew that (1) Mr. Reed would be incarcerated for life and (2) that the offenses alleged at the punishment phase were not typical violence that would be expected between male prisoners.  Smithey's expert opinion was therefore necessary to prove that despite his incarceration for life, Mr. Reed would still be dangerous.  This testimony was obviously intended to affect the jury's decision and in the context of the punishment phase allegations, was a necessary factor in converting accusations of heterosexual rape into a propensity for violence against other male inmates in prison.

### E.    The Totality of the Evidence Proves Innocence

Because the case for innocence is laid out in the Application, this Response will only address those points raised by the State in its Motion to Dismiss that are not covered in the Application.  *See* Motion to Dismiss at 45-54.   In its Motion to Dismiss, the State attempts to paint the new evidence as "more of the same" and otherwise unreliable.  But as with many of the points raised in the Motion to Dismiss, the State's arguments do not hold up to a close examination of the record.

---

[6] Another discrepancy can be found in the State's description of Mr. Reed's arrest arising out of the Schluter allegation, a case in which no physical evidence linked him to the crime and he was identified in a suggestive photo lineup.  In its Motion to Dismiss, the State asserted that Mr. Reed was arrested for "kidnapping, beating, and attempting to rape and murder" Schluter.  Mr. Reed has reported, and evidence at a hearing should confirm, that the actual charge on which he was arrested did not involve rape or kidnapping, but was for unauthorized use of a motor vehicle.

27

The State's "more of the same" argument ignores the recent and dispositive forensic discovery that Ms. Stites was murdered sometime before midnight on April 22, 1996 and that her body was moved in Fennell's truck to the spot where she was found at least 4 hours after she was killed. *See* Application Exhibits 3 (Dr. Spitz), 4 (Dr. Baden), 5 (Dr. Riddick). This discovery was made on October 21, 2014 by a disinterested[7] retired NYPD homicide investigator, Det. Sgt. Kevin Gannon as part of his review of the evidence for the television crime show "Dead Again". *See* Application Exhibit 40 ¶4-5 (Affidavit of Kevin Gannon). From his review of the crime scene photos, video, autopsy report and law enforcement investigation reports, Det. Sgt. Gannon noticed evidence of decomposition pointing to a longer post-mortem interval and lividity patterns showing that the body had been moved. *Id*. Neither the State's forensic team during the murder investigation or the forensic experts originally retained as part of the prior habeas investigation conducted in 2002 noticed this evidence or recognized its importance.

After undersigned counsel was contacted by Det. Sgt. Gannon, his observations were immediately presented to Dr. LeRoy Riddick, who confirmed that Gannon's conclusions were supported by the forensic medical science. *See*

---

[7] Detective Sergeant Gannon was not retained by Mr. Reed's counsel, and the show Dead Again is not focused only on covering cases of innocence. For example, "Dead Again" produced an hour-long episode covering the Darlie Routier case in which Gannon and other officers agreed that the evidence established the defendant's guilt. http://www.aetv.com/dead-again/season-1/episode-4 (last visited 4/6/2015)

Exhibit 5 ¶ 5 (discussing re-evaluation in fall of 2014). Undersigned counsel then consulted with two of the most experienced and renowned forensic pathologists in the country, Drs. Werner Spitz and Michael Baden. Both also agreed with Det. Sgt. Gannon and Dr. Riddick that the State's theory of Mr. Reed's guilt was medically and scientifically impossible. Application Exhibit 3 ¶ 3 (Spitz); Exhibit 4 ¶ 11 (Baden). The evidence is unquestionably new.

The State's also renews its criticism of Mr. Reed for not presenting a "cohesive theory" of innocence.[8] Because undersigned counsel did not discover the forensic evidence contradicting the estimated 3 a.m. time of death, we believed and presented during the prior post-conviction proceedings the eyewitness account of Martha Barnett who claimed to have seen Fennell and Stites arguing by the side of the road on the morning of April 23, 1996 as well as evidence of another citing of Ms. Stites that morning by the Praters. *See Ex parte Reed*, 271 S.W.3d at 717, 741-42.

Based on the new forensic evidence discovered first by Det. Sgt. Gannon in October 2014 and confirmed by Drs. Spitz, Baden, and Riddick, there is no doubt that the Praters and Ms. Barnett's account were not accurate. *See id*. at 721

---

[8] This argument contradicts its "more of the same" contention because it is premised on the fact that the forensic conclusions which rule out the State's estimate of a 3 a.m. time of death and prove that Ms. Stites was moved at least four hours after she was killed were not before this Court in any prior proceeding.

(finding Barnett not credible in part because she had been arrested by Fennell).[9]

The new forensic evidence fills in the holes in the evidence before the Court in 2008 which led to the Court's description of the innocence theory as "disjointed and fragmented". *Id*. at 746. The new forensic proof gives a much clearer understanding of how and when Ms. Stites died, placing the murder at a time when both Fennel and Carol Stites testified Stacey was at home with Fennell. The evidence that Ms. Stites was killed at least 4 hours before she was transported in the truck and dumped off the side of a gravel road is consistent with the theory that Ms. Stites was killed earlier by Mr. Fennell and, more importantly, conclusively disproves the State's theory that Mr. Reed abducted Ms. Stites and murdered her while she was driving to work at around 3 a.m.

---

[9] The State's reference to the discredited account of Martha Barnett highlights the role of cognitive bias which likely contributed to the failure of all parties to discover what in retrospect seems to be obvious forensic evidence disproving Mr. Reed's guilt. Cognitive bias is a recognized hazard in reliably investigating and adjudicating criminal cases. *See Keith Findley and Michael Scott*, The Multiple Dimensions of Tunnel Vision in Criminal Cases, 2006 Wis. L. Rev. 291 (2006) (discussing impact of cognitive bias as reflected in wrongful conviction cases). In this case, the State's theory of Mr. Reed's guilt was built around the presumed fact that Ms. Stites left for work around 3 a.m. on April 23, 1996. There was no reason to question Dr. Bayardo's estimation of a 3 a.m. (give or take an hour or two) time of death because it fit neatly into the State's theory of the crime.

In the context of the earlier post-conviction proceedings, Dr. Bayardo's flawed time of death estimate likewise fit the newly discovered *Brady* evidence of Martha Barnett's account of seeing Fennell and Stites together within that time frame. While it is certainly unsettling to think that tunnel vision affected the way that the parties investigated and presented the evidence in this case, neither side had an incentive to re-examine Dr. Bayardo's time of death estimate and, in fact, both sides missed the forensic evidence discovered by Det. Sgt. Gannon that conclusively disproved both side's prior theory of the case.

Unable to truthfully undermine the new forensic evidence, the State next revives this Court's prior concerns that no credible witnesses could corroborate a consensual relationship between Mr. Reed and Ms. Stites. The primary criticism levied by this Court as to witnesses who previously offered testimony that they knew of the relationship focused on the relationship between the witnesses and Mr. Reed or other aspects of these witnesses character such as a criminal history. *See Ex parte Reed*, 271 S.W.3d at 737.[10] None of these critiques apply to the new witnesses who (1) have no motive to fabricate knowledge of a relationship between Stites and Reed and (2) provide reasonable explanations for not coming forward earlier.[11]

---

[10] In one instance, the Court relied on inaccurate scientific evidence in discounting the credibility of Jon Aldridge, who corroborated Mr. Reed's account of being threatened by Fennell and stated that he saw Mr. Reed and Ms. Stites together once taking cocaine. *Id*. at 737 (citing pre-trial hair drug test showing Stites was not "a cocaine user"). Attached to Mr. Reed's application is the Affidavit of Robert Johnson Ph.D., Director of the Toxicology and Chemistry Lab at the Tarrant County Medical Examiner's Office, who examined this report relied on by this Court and concluded:

> I do not believe that the toxicology test conducted in 1998 supports the conclusion that Stacey Stites did not use cocaine, because the test could not detect occasional use.

Application Exhibit 25 ¶ 14. Dr. Johnson explained that the sensitivity of the test done in 1998 would only detect cocaine matabolites in hair at levels resulting from heavy use, above 1000 nanograms per gram of hair. Id. at ¶7, 12 (results below 1000 nanograms were not reported). When Mr. Reed sought to retest Ms. Stites's hair using modern technology that would detect occasional use (as low as 7.4 nanograms), the State objected. *See* Motion for Additional Testing, *Reed v. Dretke*, 02-CV-00142 (W.D. Tex.) (Docket # 169).

[11] This Court should not place much weight on Mr. Reed's denial of a relationship with Ms. Stites when initially confronted by police after being arrested on drug charges. *See* Motion to

Unlike many of the witnesses rejected by this Court, the new witnesses confirming the relationship did not know Mr. Reed personally, but were friendly with Ms. Stites. Both Alicia Slater and LeRoy Ybarra worked with Ms. Stites at the HEB. Although the State casts Ms. Slater's account of Ms. Stites confiding her affair as "patently unbelievable", Ms. Slater acknowledges that she was "taken aback" by the revelation. Application Exhibit 6 ¶5. However, it is quite understandable that a teenaged girl in Ms. Stites's circumstances would seek to unburden herself of this secret to a friend who was not close to her family or fiancé and would be more likely to be discrete. And Ms. Slater's desire not to get involved is also reasonable given the known corruption in Bastrop law enforcement at the time and the level of intimidation by the police during the months following the murder described by Mr. Reed's retained counsel Jimmy Brown. *See* Exhibit B (Affidavit of Jimmy Brown).

LeRoy Ybarra was another co-worker at the HEB who witnesses interactions between Ms. Stites and Mr. Reed. He was not affiliated with Mr. Reed's family and also had no motive to fabricate his account. Mr. Ybarra's explanation for not

Dismiss at 46. A false denial in the context of this case, where Fennell (a law enforcement officer) had previously threatened Mr. Reed is understandable. *See* Application Exhibit 38 ¶6 (Affidavit of Rodney Reed). False statements by an innocent person when accused of a crime are common contributors to wrongful convictions. Roughly 25% of DNA exonerations involve false confessions. *See* Douglas Keen and Rita Handrich, Only the Guilty Would Confess to Crimes: Understanding the Mystery of False Confessions, The Jury Expert 2 (November/December 2012). The same dynamics that lead a person to falsely confess under interrogation would likely apply with greater force to an innocence suspect making a false exculpatory statement.

coming forward earlier was based on the reasonable fact that, as a completely

disinterested party, he did not know that what he witnessed had any bearing on the

case:

> I did not read any more news articles about the death of Stacey Stites
> because I have rarely taken the time to read newspapers or to watch
> the news. I don't know what happened between the two of them but I
> thought it was a sad thing because they looked pretty happy when they
> were together. I just thought it was a terrible tragedy.

Application Exhibit 7 ¶7. Because Mr. Ybarra didn't know that the State

convicted Mr. Reed on the theory that he was a stranger to Ms. Stites, Mr. Ybarra

had no reason to come forward.[12]

And since the filing of Mr. Reed's Application, Ms. Stites's own cousin has

come forward with information that he saw Mr. Reed and Ms. Stites together one

evening at a Bastrop Dairy Queen:

> 5.     One Sunday evening, around five, or six o'clock in 1995, two
> of my young children, Jaymi and Whitford, and I went to the Dairy
> Queen in Bastrop to get some ice cream. I remember they were young
> at the time—both were under the age of ten. I also remember it was a
> warm day, but the weather was not hot or humid as is typical in Texas
> summers. I believe it was sometime between October and November.

---

[12] The failure of bystanders to report information related to a crime is common and well documented. Perhaps the most famous instance of this phenomena was reported in the 1964 murder of Kitty Genovese in a quiet middle-class neighborhood in Queens, NY where 37 people witnessed the murder but did not call the police. *See* Martin Gansberg, 37 Who Saw Murder Didn't Call Police, New York Times (March 27, 1964).

At that time in my life I worked as a carpenter and did not get Saturdays off. The only day I would have been able to take them for ice cream would have been on a Sunday.

6. As I pulled into the Dairy Queen in the Ford pickup I was driving at the time, with my children inside, I remember seeing Stacey coming out of the Dairy Queen with a black man. I hollered her name to get her attention as I drove in, but she did not respond. I know they heard me because both Stacey and the black man looked directly at me, but neither came toward me. I have a rather loud voice; I easily project and rarely have a difficult time being heard.

7. Seeing Stacey with a black man did not surprise me because I remembered what my parents told me about her dating and associating with black men. Stacey, however, was shocked; she seemed embarrassed when she saw us and she quickly left with the black man without introducing me. Stacey and the black man got into a darker colored car that Stacey was driving, and they drove off without speaking to me or my children. I told my father of this incident, but to me it was not a big deal at the time because I had been told that Stacey associated with black men.

8. Sometime after Stacey's death I remember seeing pictures of Rodney Reed on the news and in the newspaper after he became a suspect in the death of my cousin. Rodney Reed is the same man I saw with Stacey at the Dairy Queen in 1995. I understand that the appeals courts have previously said that there were no credible witnesses that would testify as to having seen Rodney and Stacey together. I would have testified to my experience at the Dairy Queen in 1995 at trial, but no one ever approached me to do so. Since then, I have told other members of my family and would have told law enforcement and prosecutors the same had they interviewed me or shown any interest.

9. Because of this information, and Stacey's behavior at this time in her life, I have always believed Mr. Reed's story that he had a

34

relationship with my cousin Stacey—despite the unfortunate pain it brings upon my aunt Carol. I do not wish to cause her, or my family, any more pain. I simple want to bring this truth to light.

See Exhibit A (Affidavit of Calvin "Buddy" Horton). Mr. Horton has bravely told the Court what he saw that day even though it will create a rift in his family and undoubtedly subject him to unwanted attention in the small community where he lives. None of these witnesses have any motive to fabricate evidence that Ms. Stites and Mr. Reed were in a relationship and each have provided a detailed account of what they know and why they did not come forward earlier.[13]

The State's response to Mr. Reed's compelling evidence of innocence—like its opposition to meaningful DNA testing—demonstrates an alarming refusal to confront the evidence in this case head on. Once this Court reads past the State's distortion of the law and its misleading citations to the record, the evidence in Mr. Reed's Application provides a cohesive narrative pointing to Mr. Fennell as the murderer and disproving the State's theory of Mr. Reed's guilt. The forensic evidence sets the murder at a time that Ms. Stites was at home with Fennell and indicates that Fenell dumped the body hours later in the spot where it was found. Law enforcement records show that Fennell's associates, especially his close friend and Giddings resident Curtis Davis, had the opportunity to give Mr. Fennell a ride

---

[13] The State questions the credibility of these witnesses citing the fact that they didn't come forward in response to a $50,000 reward. *See* Motion to Dismiss at 53. But this argument actually demonstrates a lack of financial motive to fabricate. Had these witnesses sought a reward, the State would no doubt cite this as evidence undermining their credibility.

35

home after he left his truck in Bastrop.  *See* Application at 25-26. And the new credible evidence of a relationship between Mr. Reed and Ms. Stites both explains the presence of Mr. Reed's semen and provides motive for Fennell to murder his fiancé.  The evidence as a whole now establishes innocence under both the *Elizondo* and the Schlup/section 5(a)(2) standards.

## IV. Conclusion

The Texas Legislature and this Court's jurisprudence recognize that evidence of innocence can be discovered long after conviction, even after multiple rounds of post-conviction proceedings.  Where persuasive evidence of innocence is discovered, procedural barriers must fall and the Court should engage in a straight-forward examination of the evidence.  Cases like the exoneration of Anthony Graves and the recent Alabama death-row exoneration of Anthony Ray Horton stand as reminders it can take decades for the truth to surface after a wrongful conviction.

Mr. Reed's case is no different.  The nagging questions about the evidence which this Court described in 2008 as a "healthy suspicion" of Fennell's involvement have now been shown to be the tip of the iceberg.  The evidence detailed in Mr. Reed's application undermines every aspect of the State's case and provides a compelling and cohesive narrative of how and why Mr. Fennell could have murdered his fiancé.  This evidence falls squarely within the Court's

innocence jurisprudence as well as the newly recognized causes of action for new science (article 11.073) and unintentional false testimony (*Ex parte Chabot*). Accordingly, Mr. Reed asks this Court to order a full evidentiary hearing on the claims for relief presented in his Application and, based on the evidence developed at this hearing, grant his application reversing both his conviction and sentence of death.

Respectfully submitted,

/s/ Bryce Benjet_____
BRYCE BENJET
State Bar No. 24006829
THE INNOCENCE PROJECT
40 Worth St. Suite 701
New York, New York 10013
(212) 364-5340
(212) 364-5341 (fax)

ANDREW F. MACRAE
State Bar No. 00784510
LEVATINO|PACE LLP
1101 S. Capital of Texas Highway
Building K, Suite 125
Austin, Texas 78746
(512) 637-8563
(512) 637-1583 (fax)

*Attorneys for Applicant Rodney Reed*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing Response to State's Motion to Dismiss Application for Writ of Habeas Corpus as Abusive has been served on the attorneys for the State by placing same in the United States mail, certified/return receipt requested, on this 7th day of April 2015, addressed and electronically sent to:

Matthew Ottoway
Assistant Attorney General
209 West 14th St.
P.O. Box 12548
Austin, Texas 78711

Bryan Goertz
Bastrop District Attorney
804 Pecan St.
Bastrop, Texas 78602

/s/ Bryce Benjet_____
BRYCE BENJET